GRAY *v.* TRICK.

1. FRAUD—EVIDENCE SUFFICIENT TO SHOW FRAUDULENT INDUCE-MENT TO SELL STOCK.

In a suit for the rescission of a sale of corporate stock on the ground that it was induced by fraudulent representations, evidence showing that plaintiff had no knowledge of the value of the stock, that he so informed defendant, that defendant told plaintiff that it was not worth $41 a share, but that he would give that price because he could turn it in on a deal at $50 a share, whereas in fact defendant knew that it had a market value of at least $90 a share, and, instead of turning it in on a deal, within 15 days he sold it for $100 a share, *held*, sufficient to establish plaintiff's case.

2. SAME—ELECTION OF REMEDY—DAMAGES.

>One defrauded of property is entitled, at his election, either to a return of the property or to damages for his loss.

3. SAME—DAMAGES—EQUITY.

>If the wrongdoer still owns or has possession of or control of the property out of which he defrauded another, equity will compel him to return it, but if he cannot return it, the court may only award damages in lieu thereof.

4. SAME—DAMAGES—WHERE IDENTICAL PROPERTY NOT RETURNABLE MONEY JUDGMENT GIVEN IN LIEU OF ITS RETURN.

>Where defendant fraudulently induced plaintiff to sell for $41 a share stock which was worth $100 a share, and at the time of the trial defendant did not own the identical shares, although he had some of the same class and character, the decree requiring him to return to plaintiff a like number of shares is reversed, on appeal, and plaintiff is given a decree for the difference between the amount paid by defendant and the actual value of the stock at the time of the sale.

Appeal from Berrien; White (Charles E.), J. Submitted April 25, 1928. (Docket No. 88, Calendar No. 33,675.) Decided July 24, 1928. Rehearing denied October. 1, 1928.

Bill by Humphrey S. Gray against Samuel W. Trick for the rescission of a sale of corporate stock on the ground of fraud. From a decree for plaintiff, defendant appeals. Reversed, and decree entered for plaintiff based on the value of the stock at time of sale.

*John J. Sterling,* for plaintiff.

*Gore & Harvey* (*Knappen, Uhl & Bryant,* of counsel), for defendant.

McDONALD, J. The plaintiff sold to the defendant 375 shares of stock of the McLellan Stores Company, a Delaware corporation. On the theory that the sale was induced by fraud, the plaintiff brought this suit

to rescind and to compel a return of the stock with dividends received by the defendant from the date of sale. On the hearing, the circuit judge found fraud as alleged and decreed a return of the stock on repayment of the purchase price. The defendant has appealed.

Both of the parties are residents of Benton Harbor, Michigan. They have been close friends and business associates for many years. The plaintiff is a lawyer. The defendant formerly was engaged in the operation of a chain of five and ten-cent stores, one of which was located in Benton Harbor. He is now employed by the McLellan Stores Company.

On January 1, 1920, defendant sold his stores to the McLellan Stores Company, which was at that time a North Carolina corporation operating five and ten-cent stores in various places throughout the United States. In the transaction involving the sale, the plaintiff acted as defendant's counsel. As part of the consideration, the defendant received a considerable quantity of stock of the purchasing company. At the plaintiff's request, he sold to him $25,000 worth of this stock, for which the plaintiff gave his note for $25,000 and agreed that the stock should remain in the defendant's name on the books of the McLellan Company until the note was paid. In this way, the plaintiff became the owner of 250 shares of the preferred stock of the par value of $25,000 and 125 shares of common stock of no par value.

In June, 1924, the McLellan Stores Company was reorganized under the laws of the State of Delaware. In the reorganization, the plaintiff's holdings were changed to 375 shares of Class A, common no par stock. It is this stock which is involved in the pending suit.

On November 3, 1925, the defendant went to the plaintiff's office and negotiated for the purchase of his stock. The plaintiff did not desire to sell, but,

after some negotiations, an agreement was reached in which the defendant was to receive the 375 shares of stock and to pay therefor $10,500 in cash, to surrender the $25,000 note, on which there was an unpaid balance of $5,000, and to give the plaintiff 38 shares of the preferred stock.    This consideration was on a basis of $41 a share.

It is the plaintiff's claim that he did not know the value of the stock; that, because of their close friendship and business relations, he relied implicitly on the defendant's representations as to its value.    He says that the defendant knew the value of the stock; that he told him that it was not worth $25 a share; that it had no market value; and that the only reason he could pay $41 a share for it was that he was going to turn it in at $50 a share to his brother as part payment on the purchase of some Florida land.    The plaintiff testified:

"I said I ought to look it up, and he said, 'I have to close the deal to-day,' and I said, 'S. W., if you say to me as you would man to man, a friend to a friend,' as we had been, 'if you say to me you are turning your stock in at $50 on a trade and that you know the value of this stock as much as anybody could know it and you say it is not worth $40 and is not worth $25, I will take your word for it and you can have my stock.'"

The defendant testified:

"I didn't know anything about the stock if there was any market or not, but I told him the value of the stock as near as I could figure it out couldn't be at the outside around $40.    The financial statement on January 1st, showed the stock as I remember was $29 or $30, and that could not possibly have earned over $10 during that time, so the stock couldn't possibly be worth in value over $40 a share."

On cross-examination he testified:

"*Q.* I am asking if Mr. Gray didn't state to you at the time you purchased this stock during the negotia-

tions he didn't know the value of the stock; he would have to rely on you?

"*A.* I think he did—he might have said that.

"*Q.* That is what he did say, isn't it, Mr. Trick?

"*A.* I don't know exactly, but I think probably he did.  *  *  *  I don't know whether I told him there wasn't any market or not.    I had never heard of any."

The stock was purchased on Tuesday, November 3, 1925.    It is the claim of the plaintiff that on Friday, October 30, 1925, a brokerage firm of New York City wrote and mailed to defendant at Benton Harbor a letter in which they offered him $90 a share for 200 shares of his stock; that the defendant received this letter before he closed the deal with the plaintiff; and that when he represented the stock had no market value, and was not worth more than $40 a share, he knew that it had a market value of at least $90.    The defendant denies having received this letter before his deal with the plaintiff.    He says that he had ordered his mail forwarded to Kokomo, Indiana, and that he first saw the letter when it was delivered to him there on November 16th.

The essential elements of the plaintiff's case are satisfactorily established by the record.    It shows that he had no knowledge of the value of the stock; that he so informed the defendant; that defendant was in haste to close the deal; that he knew the plaintiff had the utmost confidence in him and was relying on his statements as to value; that he represented it had no market value and was not worth more than $40 a share; that he was able to pay that much for it because he could turn it in at $50 on Florida land which he was purchasing from his brother.    It is conceded that it did have a market value of at least $90 and upwards and that the defendant did not turn it in on a Florida land contract, but, within 15 days from the day he purchased it of the plaintiff, sold it for $100 a share to a firm of brokers in New York City.

In a well-reasoned opinion, the circuit judge reviews the evidence and reaches the conclusion that, when the defendant purchased the stock, he had full knowledge of its value; that he derived his knowledge from the fact that he had a very substantial interest in the company and was in close touch with its officers, with whom he frequently conferred, and that he had received a letter from a firm of brokers offering him $90 a share for his stock; that with this information, which he knew was not available to the plaintiff, he made haste to close the deal before the 'real value of the stock should become generally known. We agree with the conclusion of the circuit judge. It is not necessary to extend this opinion by any detailed analysis of the testimony. Our examination of the record leaves no doubt that the sale of the plaintiff's stock was induced by fraudulent representations on the part of the defendant.

The only other question presented by the record relates to the relief decreed to the plaintiff.

The decree provides that the defendant—

"procure and deliver to Humphrey S. Gray, the above named plaintiff, within ten days from and after the date of the entry of this decree, said three hundred and seventy-five (375) shares of Class A common stock of McLellan Stores Company of Delaware, without nominal or par value, mentioned and described in said bill of complaint."

The prayer of the bill is that defendant be required to return the plaintiff's stock on repayment of the purchase price and place the parties *in statu quo* or to deliver to the plaintiff 375 shares of Class A common stock of no par value or,

"In lieu of the foregoing relief, that the said defendant pay in cash to said plaintiff a sum of money equal to the market or cash value of said stock on November 3, 1925, less the amount of money said defendant paid plaintiff for said stock on, to wit, November 3, 1925."

The court could not decree a return of the particular stock which the defendant purchased of the plaintiff because the defendant sold that stock on the 18th of November, 1925. But the defendant still has more than 375 shares of stock of the same class and character. The question is whether in this case equity can compel him to surrender to the plaintiff 375 shares of that stock. It is now worth in excess of $175 a share.

Our attention has not been called to any cases which hold that a court of equity can compel a defendant to substitute stock of like character for that obtained in a fraudulent purchase. At his election, the plaintiff is entitled either to a return of the property of which he has been defrauded or to damages for his loss. If the wrongdoer still owns or has possession of or control of the property, equity will compel him to return it. If he cannot return it, the court can only award damages in lieu thereof. And in assessing damages, the plaintiff is entitled to a money decree for his actual loss by reason of defendant's fraud. His actual loss is the difference between what defendant paid him for the stock and its market value at the time of the sale. From the fact that the defendant almost immediately sold the stock in the open market for $100 a share, we may assume that $100 was what he ought to have paid the plaintiff if he had dealt fairly. Instead, he paid $41. The plaintiff's loss on the sale of 375 shares was $59 a share, or $22,125. He is entitled to a decree in that amount. In respect to the relief granted, the decree of the circuit court is reversed. A decree will be entered in accordance with this opinion. Neither party will be allowed costs.

FELLOWS, WIEST, CLARK, and SHARPE, JJ., concurred. FEAD, C. J., and NORTH and POTTER, JJ., did not sit.